Joe Moore, Administrator of the Estate of Vernon F. Adair, Deceased, Plaintiff-Appellant, v. The Atchison, Topeka and Santa Fe Railway Company, a Corporation, Defendant-Appellee.

Gen. No. 47,989.

First District, Second Division.
December 20, 1960.
Rehearing denied January 31, 1961.

William H. De Parcq and Robert J. Martineau, of Chicago (Charles Alan Wright, of counsel) for appellant.

Floyd Stuppi, William J. O'Brien and John J. Schmidt, of Chicago, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

The Administrator of the Estate of Vernon F. Adair, deceased, sued on behalf of the widow and seven dependent children under the Federal Employers' Liability Act to recover damages for his death caused by the alleged negligence of defendant in a collision of two of its trains. Following a verdict and judgment for the defendant, and the denial of motions for judgment notwithstanding the verdict or for a new trial, plaintiff appealed.

At 12:36 A. M. on July 5, 1955, two trains of the defendant came together in a head-on collision on a single track main line near Cardenas, New Mexico. Adair, the head brakeman on one of the trains was killed. He was head brakeman on a train designated as "241 West." The other members of the crew were J. C. Cenipe, the engineer, I. W. Bell, the fireman, C. C. McDaniel, the conductor, and D. Moreland, the rear brakeman. Cenipe and Bell were also killed in the collision. Cenipe had been an engineer for about 32

years and knew how to check out a train. He arose at 9:30 that morning and spent most of the day at home. He was in good health. He had a plate in his head from a previous accident but it was not known to cause him any trouble. Bell had 14 years railroading experience and had been promoted to engineer. He arose that morning about 6 o'clock and spent the day at the site of the house he was building. He appeared to be in good health that day. The engineer and fireman were good, competent employees.

Adair appeared to be in good physical condition when he appeared for work the night of the occurrence. He had passed the examination for and had been promoted to conductor. He was conversant with defendant's rules which, among other things, placed responsibility on him for communicating to members of the engine crew the indication of each signal affecting movement of the train. In case of emergency he was required to call it to the attention of the other employees and do what he could to meet it safely, including stopping the train. As head brakeman Adair was in the cab of extra "241 West" along with the engineer and the fireman. The engineer and fireman were primarily responsible for keeping a lookout ahead. Under the company rules if the engineer failed to observe signals or became incapacitated the fireman was required to stop the train. The rules provided that the engineer must require the brakeman to look back over the train frequently to detect any defect in the train and for signals. The engineer must not permit even the fireman to operate the engine except when he has been qualified by a certain amount of experience. There is no evidence that on that night Adair had either the occasion or the authority to touch the controls of the locomotive.

The westbound train, "241 West," consisted of 3 diesel-electric units, 132 freight cars and a caboose.

It was a mile and a quarter long. In the cab of the diesel from which the train was operated, the engineer's seat was on the right side, the fireman's on the left and the brakeman's in the middle. The train with which "241 West" collided was designated as "Extra 205 East." It was made up of 4 diesel-electric units, 84 cars and a caboose. The crew of that train consisted of E. G. Abernathy, the engineer, W. B. Hester, the fireman, C. H. Peterson, the conductor, J. W. Fryer, the head brakeman, and E. W. Hailey, the rear brakeman. Abernathy and Fryer were killed in the collision. The diesel units on "241 West" were given the yearly, monthly and daily electrical and mechanical tests and inspections required by the Interstate Commerce Commission, and were found to be in perfect running order. The only defect noted in this equipment by the last engineer who operated it was a leak in the radiator of one unit, which was held at Clovis, New Mexico, for repairs and was not a part of the train at the time of the collision. This train departed from Clovis, New Mexico, at approximately 8:05 P. M. on July 4, 1955, heading west to Vaughan, New Mexico, 130.8 miles away.

The eastbound train, "Extra 205 East," left Vaughan headed east to Clovis at approximately 12:05 A. M. on July 5, 1955. Its headlight was in proper working order and was on up to the time of the collision. Both "241 West" and "Extra 205 East" were equipped with a safety pedal located immediately in front of and below the engineer's seat. It requires about 3½ or 4 pounds of pressure from the engineer's foot to depress this pedal to the floor. If for any reason the engineer's foot is released from the safety pedal the train's brakes are automatically applied. When "241 West" departed from Clovis the gauge in the caboose which reflects the air pressure in the train's braking system showed 70–75 pounds of pres-

sure, within the allowable minimum of 80 pounds. The brakes on "241 West" worked properly when used that night at Tolar, New Mexico, at 9:36 P. M., about 50 miles east of Cardenas. The brakes on "Extra 205 East" tested normally before it departed from Vaughan.

At the point of the occurrence, Cardenas, New Mexico, defendant operates a single-track main line along which are numerous sidings to permit trains to pass one another. The movement of trains in this area is governed by signals and switches controlled by a dispatcher located at Clovis, under a system referred to as "Centralized Traffic Control" or simply "C. T. C." The track and roadbed in this area are inspected regularly and were inspected the day before the collision and found to be in good condition. On the C. T. C. machine at Clovis there is a track diagram and a series of lights and levers showing the status of signals and switches in the territory covered. A graphic record of the operation of signals and switches is maintained by the machine. The dispatcher in charge of the C. T. C. machine governs the movements of trains in the C. T. C. territory covered by the particular machine. He can determine from the machine approximately where trains will meet, and when two trains are approaching one another he switches one into a siding in order that the other train may pass. While the dispatcher cannot at all times determine the exact location of all the trains in the territory, he can tell whether a train is on a "O. S. Circuit" (a 500 foot stretch of track extending from either side of the switch) between "O. S. Circuits" or that it is in a siding, and can thereby follow its progress as it moves through these points.

If a switch operated by the dispatcher fails to lock properly the C. T. C. machine automatically puts the signals at that point in a red condition. All switches

are equipped with a time control safety device which requires the lapse of approximately 5 minutes before a switch can be reversed, once signals have been cleared for an opposing movement. If the dispatcher directed a westbound train into a siding in order to let an eastbound train pass and gave the eastbound train a green board (signal), he could not, in the face of that green light, reverse the switch and let the westbound train out of the siding. If the westbound train in the siding disregarded the red signal against it and went out past the switch onto the main line the green signal for the eastbound train would automatically go red. The system is designed so that it is not possible to clear opposing signals in the same area at the same time, and actual tests confirmed this. Regular inspections prior to the collision failed to disclose any defects in the signal mechanisms in the area.

Train "241 West" first came into the C. T. C. territory from the east headed west at 8:50 P. M. It did not stay on the main line all the time as it proceeded westbound. It was directed into sidings to permit trains to pass at Cantara (9:00 P. M.), Krider, Tolar (9:36 P. M.), Ricardo (10:17 P. M.), Evanola (11:02 P. M.), and Yeso (11:42 P. M.). "Extra 205 East" came into the C. T. C. territory headed east from the west at 12:18 A. M. on July 5, 1955. After "241 West" and "Extra 205 East" were both in the C. T. C. territory the dispatcher ascertained that they would meet at Cardenas. Because "205 East" carried perishable commodities, while "241 West" carried mostly empties, the dispatcher determined that "Extra 205 East" should be the "superior" train, given the right of way, and "241 West" directed into a siding at Cardenas to permit it to pass. The siding at Cardenas into which the dispatcher determined to direct "241 West" is 2.28 miles long. At each end of it there are signals and switches to govern ingress and egress to and from the

347

main line. There was an "intermediate" signal along this siding to govern the movement and speed of trains operating on it. These switches and signals were regularly inspected. The switch at the west end of the Cardenas siding had been inspected and found to be operating properly only 9 hours before the collision. The dispatcher set the signal at the east end of the Cardenas siding so that "241 West" would be directed into the siding. It was his intention to put "241 West" on the siding to permit "Extra 205 East" to proceed without delay along the main line. Until "241 West" was in the siding, the signal at the east end would show red to an eastbound train. However, as soon as "241 West" was off the main line and on the siding, the dispatcher would line the main line signals and switch to show green, permitting "Extra 205 East" to pass.

The signals at the east end of the Cardenas siding were set for "241 West" to enter the siding at 12:18 A. M. on July 5. At 12:23 the signal and switch at the west end of the siding were set red against "241 West" and green for "Extra 205 East." At 12:29 A. M. "241 West" started into the siding and at 12:31 A. M. the whole train was in the siding. At that time the dispatcher changed the switch and signal at the east end of the siding to permit "Extra 205 East" to pass. As "Extra 205 East" approached the intermediate signal next west of the west end of the Cardenas siding it was green. Under the C. T. C. system this would indicate that the signal at the west end of the Cardenas siding was green to "Extra 205 East" on the main line and red to "241 West" on the siding. That was the last movement the dispatcher made prior to the collision. The signals and switches at that time were set through the C. T. C. machine so that the signals at each end of the siding should have been green to "Extra 205 East." The signal at the west end of the siding into which

348

"241 West" had been run should have been red so that it would not go out upon the main line until "Extra 205 East" had passed.

Upon leaving Yeso, 15 to 18 miles east of Cardenas, "241 West" maintained its speed of 18–20 m. p. h. It proceeded into the Cardenas siding at a speed of 20 m. p. h. or less. It never slowed down. Instead of stopping, it proceeded at an even speed of about 20 m. p. h. along the siding to the west end where it re-entered the main line. Due to the nature of the terrain and the curvature of the track the conductor could not see the signal at the west end of the siding before the head end of the train passed it. After re-entering the main line "241 West" proceeded 2620 feet to the point of collision. The brakes were never applied. After the collision the bodies of the three men in the cab were found in their seats, Cenipe, the engineer, in the engineer's seat, Adair, the head brakeman, in the fireman's seat, and Bell, the fireman, in the brakeman's seat. About 20–45 seconds before the collision the engineer of "205 East" made an emergency application of the brakes on his train. At the time of the impact "241 West" was traveling at a speed of about 20 miles and "Extra 205 East" at approximately 50 m. p. h. After the collision it was found that the signal at the west end of the siding was red against "241 West" and that the switch point had been run through. Upon inspection it was found that the signal and switch were functioning properly through the C. T. C. machine. At 12:32 the eastbound train passed Duoro, 4.5 miles from the west end of the Cardenas siding. At any time after 12:28½ it would have been possible for the dispatcher to change the signal and switch at the west end of Cardenas to permit "Extra 241 West" to return to the main line, but he testified that he did nothing to give the westbound train a green board. While it was not raining at the time of the

collision, it was sultry and hot and there was lightning "flashing around." Earlier, between Evanola and Yeso, "241 West" had gone through a severe "electrical storm." The conductor testified that to his knowledge no lightning struck the train and it stopped without incident at Yeso to wait for a "superior" train.

 Plaintiff insists that the trial court should have entered judgment notwithstanding the verdict in his favor on the issue of liability, leaving the issue of damages to be determined by a jury. In his post-trial motion the plaintiff asked for judgment in his favor notwithstanding the verdict on the ground that the verdict is contrary to the law and the evidence. Paragraph 2 of Section 68.1 of the Civil Practice Act provides that relief after trial "may include the entry of judgment if under the evidence in the case it would have been the duty of the court to direct a verdict without submitting the case to the jury, even though no motion for directed verdict was made, or if made was denied or ruling thereon reserved." The Joint Committee comments say that this language removes "any doubt respecting the propriety of a request for judgment based on the legal insufficiency of the evidence made in the first instance after trial." It cannot be doubted that the trial court had the power to grant judgment for plaintiff notwithstanding the verdict. The Federal Employers' Liability Act imposes liability on a defendant only for its negligence. Wilkerson v. McCarthy, 336 U. S. 53, 61. The jury's right to draw inferences from evidence and the sufficiency of that evidence to support a verdict are federal questions. Jesionowski v. Boston & Main R. Co., 329 U. S. 452, 457. The doctrine of res ipsa loquitur "means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to

be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury not that they forestall the verdict. Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is, whether the preponderance is with the plaintiff." Sweeney v. Erving, 228 U. S. 233, 240.

Defendant, arguing that the case was properly submitted to the jury under the doctrine of res ipsa loquitur, states that the case at bar is a classic one for application of that doctrine; that there was no direct evidence as to why the trains collided, so it became necessary for plaintiff to resort to the circumstantial evidence afforded by the occurrence itself; that the circumstantial evidence, in turn, created only a permissive inference of negligence which might be accepted or rejected by the jury and which left it open to defendant to go forward with such evidence as it could adduce tending to prove the absence of any negligence; and that defendant did go forward with the evidence, and the jury, as was its right under the res ipsa loquitur doctrine enunciated in Sweeney v. Erving, considered all the evidence and rejected the permissive inference of negligence. Defendant asserts that it produced uncontradicted testimony that the roadbed, signals, brakes and locomotives were all functioning properly, and that if the train went through a red signal it did so a full 2 minutes before the collision. Defendant inquires why the entire locomotive crew on "241 West" remained in their seats while they proceeded at only 20 m. p. h. 2620 feet down the main line to a head-on collision, and why the brakes on "241 West" were not applied before the collision, and could the lightning that was "flashing around" have anything to do with what happened. Defendant also calls

attention to the presumption in law not only that Adair was exercising due care at the time of the collision but that all other employees involved were doing the same. Daulton v. Southern Pacific Co., 237 F.2d 710, 713. Defendant states that bearing in mind that the burden of proof was at all times on the plaintiff and never shifted to the defendant, the case was one for the jury to decide and the trial court would have erred if it entered judgment n. o. v. in his favor, and states further that experience teaches that some things in life can never be understood, that the accident involved in this case is one of them and that the jury properly determined that the blame could not fairly be placed on defendant. Defendant insists that the case having been properly submitted to the jury, the courts are now powerless to disturb the jury's verdict, citing Tennant v. Peoria & P. U. Ry. Co., 321 U. S. 29, 35, and a discussion on the subject by one of the attorneys for plaintiff in Belli, Modern Trials, pp. 458, 459.

■ ■ The doctrine of res ipsa loquitur applies in FELA actions the same as the similar doctrine in any other negligence action. Jesionowski v. Boston & Main R. Co., 329 U. S. 452, 456. Since the doctrine gives rise only to a permissive inference, in most cases a directed verdict for either party would not be appropriate because it must be left to the jury whether to draw the inference of negligence from the occurrence. A leading authority on the law of evidence cites Sweeney v. Erving, 228 U. S. 233, for the proposition that normally the inference is merely permissive, but goes on to say: "Even under the view as to the normal procedural effect of the doctrine, it is recognized that the circumstances in the particular case may make the inference irresistible and entitle the plaintiff to a directed verdict when his evidence is not refuted by counterproof." McCormick, Evidence 644 n. 23. Prosser, in his work on torts (2d ed. 1955) p. 212, states:

352

"There are cases, however, such as that of the human toe in the plug of chewing tobacco, or the collision of railway trains trying to run on the same track, where the inference of negligence is so clear that no reasonable man could fail to accept it; and in such cases, if the defendant offers no explanation, a verdict should be directed for the plaintiff. In other words, the procedural effect of a res ipsa case is the matter of the strength of the inference to be drawn, which will vary with the circumstances of the case."

We are of the opinion that a plaintiff is entitled to a directed verdict in a res ipsa loquitur case if the circumstances are such as to make the inference of negligence so strong that reasonable men cannot reject it. See Alabama & V. R. Co. v. Groome, 97 Miss. 201, 52 So. 703; Hogan v. Manhattan Ry. Co., 149 N. Y. 23, 43 N. E. 403; North Chicago Street Ry. Co. v. Cotton, 140 Ill. 486, 496, 29 N. E. 899, 902; Chicago Rys. Co. v. Kramer, 234 F. 245, 249–50.

■ ■ We agree with the plaintiff that the case is a simple one. Train "241 West" went through a red signal. Plaintiff concedes that defendant established the perfection of its signal system, the competence and experience of the dispatcher, and that everything was in excellent working order and condition at the time of the tragedy, but asserts that defendant's facts offer no explanation as to how the collision could have happened non-negligently. Under these circumstances there is a presumption that the engineer and fireman were in a normal condition at the time of the collision. Virginia Ry. Co. v. Linkous, 230 Fed. 88, 92, cert. denied 242 U. S. 630. The defendant offered no evidence to vitiate the presumption and the jury was not free to speculate to the contrary. There may be reasons for going through a red light which would exclude negligence. The jury is not free to supply such reasons

353

by speculation and conjecture. The act of going through a red signal, not explained by the evidence, entitled plaintiff to a directed verdict on the issue of liability. Defendant suggested that perhaps lightning hit the engine, disabling all the employees. Defendant's witness McDaniel, the conductor, testified that to his knowledge lightning did not strike the train. Reasonable minds cannot conclude that the collision was the result of lightning when there is no evidence that lightning struck the train or that it could have disabled the engineer and fireman if it had. In 1895 the court in Rouse v. Hornsby, 67 Fed. 219, 221 (8th Cir.) said: "The time will probably never come when a collision resulting from an attempt to have two trains going at full speed, in opposite directions, pass each other on the same track, will not be held to be negligence, in law." That observation is as true today as it was then. We are satisfied that plaintiff is entitled to judgment notwithstanding the verdict on the issue of liability.

■■■■■ The court instructed the jury that if they believed from the evidence that the death of the decedent was caused in part by defendant's negligence and in part by decedent's negligence, they should consider the combined negligence of defendant and decedent as a whole, and based on the evidence should determine in what ratio the combined negligence should be distributed between them, and having determined the fact should deduct from the total amount of damages, if any, that proportion corresponding with the share of negligence, if any, charged by the jurors against the decedent and the balance, if any, or proportion corresponding with the share of negligence, if any, charged against the defendant, should be awarded as damages, if any, to the plaintiff. Plaintiff's motion for a directed verdict on contributory negligence was denied. The court also denied plaintiff's request for

354

an instruction that there was no evidence of any negligence by Adair. The burden of proof of contributory negligence in FELA cases is on the defendant. Norfolk & Western Ry. Co. v. Earnest, 229 U. S. 114, 120. Like any other fact to be found, there must be an evidentiary basis for a finding of contributory negligence. Goodman v. Chicago B. & Q. R. Co., 289 Ill. App. 320, 7 N.E.2d 393, cert. denied 303 U. S. 640; Williamson v. Wabash R. Co., 355 Mo. 248, 196 S.W.2d 129. In FELA cases there is a presumption that the deceased was engaged in the performance of his duty and exercised due care for his own safety at the time of his death. Tennant v. Peoria & P. U. Ry. Co., 321 U. S. 29, 34; Stanford v. Pennsylvania R. Co., 171 Fed.2d 632, 635; Chicago & N. W. Ry. Co. v. Grauel, 160 Fed.2d 820, 825. Defendant offered no evidence to rebut that presumption. There was no evidence on which Adair could be found guilty of negligence and it was error to submit an issue as to his negligence.

▆▆▆▆▆▆ Plaintiff complains that he was prejudiced by controversy over treatment of the fact that Adair's widow had remarried again to a man named Lary. At the outset of the case the court ruled that evidence of the subsequent marriage of the widow would not be competent, and instructed the jury that the fact that any beneficiary may have married or remarried, "if such appears in evidence or has been suggested to you is immaterial and should be disregarded by you in your deliberation." The measure of damages in actions for death under the FELA follows the rules developed under Lord Campbell's Act and comparable state wrongful death statutes. Michigan Central R. Co. v. Vreeland, 227 U. S. 59, 69–72; Dow v. Carnegie-Illinois Steel Co., 165 Fed.2d 777, 779. This is the rule applied in wrongful death actions in Illinois, where it is held proper for the trial court to instruct the jury not to consider the fact of the widow's remarriage.

Chicago & E. I. R. Co. v. Driscoll, 207 Ill. 9, 69 N. E. 620. The measure of damages under the Jones Act is the same as under FELA. Van Beeck v. Sabine Towing Co., 300 U. S. 342; Petition of United States, 92 F. Supp. 495. In actions brought under the death on the high seas Act, the statutory measure of damages is the same as that which the courts have adopted for the FELA. The City of Rome, 48 F.2d 333. See also United States v. The S. S. Washington, 172 F. Supp. 905, 908. These cases support the ruling in the case at bar that the fact of marriage is immaterial.

■■■■ The scope of the voir dire examination and the conduct of the trial is under the control of the judge. We cannot say that in the instant case the court erred in ruling on mention of the present name of Mrs. Adair, or that counsel for defendant acted in bad faith in that respect.

For these reasons the judgment is reversed and the cause is remanded with directions to enter judgment notwithstanding the verdict on the issue of liability and for a new trial as to damages.

Judgment reversed and cause remanded with directions.

FRIEND, J., and BRYANT, J., concur.