ALFA ROMEO, INC. and Modern Classic Motors, Inc., Plaintiffs,

v.

S.S. "TORINITA", her engines, boilers, etc.,

and

A/S UGLANDS REDERI, J.M. Ugland, Hoegh Ugland Autoliners, Leif Hoegh & Co. A/S, and Ugland Management Co. A/S, Fiat Soc. Per Az., and Fiat Distributors, Inc., Defendants.

FIAT MOTORS OF NORTH AMERICA, INC., Plaintiff,

v.

S.S. "TORINITA", her engines, boilers, etc.

and

A/S UGLANDS REDERI, J.M. Ugland, and Hoegh Ugland Autoliners, Defendants.

Nos. 76 Civ. 671 (DBB), 76 Civ. 1260 (DBB) and 77 Civ. 469 (DBB).

United States District Court, S. D. New York.

July 28, 1980.

Vincent, Berg, Russo, Marcigliano & Zawacki, New York City, for plaintiffs Alfa–Romeo, Inc. and Modern Classic Motors, Inc.; Stanley W. Zawacki, Carmen Anthony Russo, Frank M. Marcigliano, Harry A. Cavalas, New York City, of counsel.

Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for plaintiff Fiat Motors of North America, Inc.; Robert E. Daley, Raymond P. Hayden, Thomas E. Willoughby, New York City, of counsel.

Greenbaum, Wolff & Ernst, New York City, for defendants Fiat S.p.A. and Fiat Motors of North America, Inc.; Marcia B. Paul, Robert I. Fisher, James H. Stark, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant A/S Uglands Rederi; M. E. DeOrchis, Chester D. Hooper, Nicholas H. Cobbs, New York City, of counsel.

## OPINION

BONSAL, District Judge.

This case began as an ordinary cargo damage action in which two cargo interests sought to recover for damage to their cargo by fire while aboard the ship on January 26, 1976. Following extensive discovery, the two cargo interests sued a third cargo interest claiming that its tort caused the fire, which claim the ship gladly espoused, and cross–claimed against the third cargo interest.

In February 1976, plaintiff Alfa Romeo, Inc. ("Alfa–Romeo"), an Italian automobile manufacturer, sued the S.S. "TORINITA" (hereinafter sometimes referred to as "the ship") and her owner, A/S Uglands Rederi ("Uglands"). Subsequently, Modern Classic Motors, Inc. ("Modern Classic") was joined as a party plaintiff. Thereafter, in late 1976, plaintiffs amended their complaint to sue Fiat Soc. per Az. ("Fiat") and Fiat Motors of North America, Inc. ("FMNA") in tort, claiming that the fire was due to the defective design and manufacture of a particular Fiat automobile which was on board the ship. Uglands cross–claimed against Fiat for damage to the ship by reason of the fire. In 1977, FMNA sued Uglands and the ship in admiralty for cargo damage. The actions were consolidated and were tried to the court. Following the trial, the parties submitted factual and legal memoranda.

## THE FACTS

The TORINITA was built in Hamburg, Germany in 1970 by Blom & Voss, A.G., as a drive–on–drive–off oceangoing automobile carrier. Its design was approved by Lloyds Registry, which classified the ship as 100–A–1, and by the Norwegian government, under whose flag it operates. The TORINITA is owned by A/S Uglands Rederi and managed by J. M. Ugland. The TORINITA's history from the date it went into service until January, 1976 had been uneventful.

The TORINITA was designed and constructed with the knowledge of Fiat Soc. per Az. and was built with the carriage of Fiat automobiles in mind. Indeed, Fiat required as a condition of its use of the ship that the ship be powered by Fiat–built engines.

The design of the ship includes free, open access and ramps between car decks to enable automobiles that have been delivered dockside to be driven onto the ship via a ramp connecting the dock to deck six, and then to be driven over a series of internal ramps for stowage on one of the ten cargo decks. This design is typical of roll–on–roll–off car carriers.

The TORINITA was equipped with conventional firefighting equipment for the fighting of smaller fires. However, a sophisticated carbon dioxide ($CO_2$) system was installed to extinguish any fire that could not be successfully fought with convention-

al equipment. Under the standards of Lloyds Registry, a ship relying on a $CO_2$ system must carry enough $CO_2$ to flood the largest compartment of a ship to a thirty percent concentration. The TORINITA's system was capable of providing a forty—five percent concentration, a substantially higher level, due to the requirements of the Norway Sea Control, for the reason that the TORINITA would carry cars with fuel in their tanks and with their batteries connected. The TORINITA carried forty tons of $CO_2$, substantially more than similar type vessels. The TORINITA had a smoke detection system with the smoke detector cabinet located in the $CO_2$ room, using the same pipes to detect smoke and to distribute $CO_2$.

All of the crew members of the TORINITA were certified as having had firefighting training. The officers received extensive training, which included courses on firefighting, as a requisite for their licenses. The owner had sent the officers and crew to supplemental courses, including courses dealing with firefighting. Monthly fire drills were held on the ship. A fire drill was held on January 24, 1976, two days before the fire. When the ship was carrying automobiles, fire watches of the cargo decks were held hourly during the night and at less frequent intervals during the day.

In January, 1976, the TORINITA was chartered by Fiat, Alfa Romeo and Modern Classic to transport a cargo of automobiles from Savona, Italy to Los Angeles, California to be sold in the American market. The cars were loaded aboard from 10:10 a.m. until 7:50 p.m. on January 19 and from 6:10 a.m. until 11:25 a.m. on January 20.

Thirteen Ferraris, 359 Alfa Romeos, and 2,162 Fiats and Lancias were loaded onto the TORINITA. During the loading, Captain Leonardo Aschire, the port captain for Uglands, was in attendance on board. The stowage plan was prepared by Captain Aschire and approved by the chief officer of the TORINITA. The automobiles were transported by truck from the assembly plant to a storage silo at Savona. Long-shoremen drove the automobiles to the pier and then on board the TORINITA, where they parked the vehicles at locations designated by the ship's crew. The longshoremen were instructed to leave open the window on the driver's side when they parked the automobiles. The car keys were then removed and put in the glove compartment or on the seat or attached by a string to the steering wheel. Other longshoremen then lashed the cars into place by means of chains. The batteries were not disconnected and each car carried a small amount of gasoline in its tank. On—board, clean bills of lading were issued by the TORINITA to Fiat, Alfa Romeo, and Modern Classic covering the cargo.

The TORINITA sailed from Savona on January 20, 1976 under the command of Captain Thorlief Midberg, who had served as her master since November 18, 1975; before that, he had served for three months as master of the TORINITA's sister ship, the SAVONITA. Captain Midberg had previously served with Uglands as a chief officer and at lower ratings.

Shortly before the fire broke out on January 26, 1976, a fire watch was conducted by able—bodied seaman Martinez. According to Martinez' deposition, he left the bridge at 1310, went down from deck one to deck ten, and then back up to deck six, from where he telephoned the bridge at 1330 to report: "Everything is okay."

At 1442, the smoke detection alarm sounded on the bridge. The first officer on watch on the bridge, Per Byholt, directed seaman Martinez to go to the car decks to investigate the source of the smoke; the first officer then telephoned the engine room ordering the electrician, Sollie, to go to the $CO_2$ room to check the source of the smoke or to ascertain if there was a malfunction of the smoke alarm. Before Martinez reached the car decks, the electrician, Sollie, reported seeing smoke on deck six while on his way to the $CO_2$ room. At 1445, the first officer sounded the fire alarm and the crew assembled near the lifeboats.

The chief mate, the chief engineer, and the boatswain went into the cargo holds to

deck six; the boatswain had an air–breathing apparatus with him which he did not use. On arrival at deck six, they observed smoke billowing towards them from the direction of the bulkhead separating section 6–B and reported this to the captain, who had arrived on the bridge immediately after the fire alarm was sounded. At 1448 a radio was sent from the ship: "We are on fire. $CO_2$ equipment released."

The ship's engines were stopped at 1455. At that point, the chief mate went to the bridge and advised the master that the fire was on deck five or deck six. At 1456, the captain having ascertained that all of the crew were accounted for, ordered $CO_2$ into decks six and seven. Nineteen minutes later, at 1515, the captain ordered $CO_2$ for all the cargo decks. At 1520, canvas covers were ordered over the ventilators and fans. At 1535, the $CO_2$ system was shut down, and shortly thereafter crew members began to check the cargo decks. By 1630, the crew was able to use hoses in the cargo spaces to cool off the steel decks. The fire was declared out at 1745.

The TORINITA continued her voyage, arriving at Freeport, Texas on February 3, 1976. Representatives of the New York Testing Laboratory met the ship at Freeport and made an inspection on behalf of FMNA. The ship then continued through the Panama Canal to Los Angeles, arriving on the evening of February 14, 1976, nineteen days after the fire.

Three fire investigators boarded the TORINITA shortly after it arrived in Los Angeles. These were Frank Rushbrook, retained by Alfa Romeo and Modern Classic; Joseph F. Connor, retained by the ship; and John F. Connell, retained by FMNA. Each of these investigators was of the opinion that the fire originated in a 1976 Fiat Spyder, Serial No. 10106642 ("the target car"), which was stowed on deck six, section B. Both Mr. Rushbrook and Mr. Connor testified at trial that they thought the fire was caused by a failure in the electrical system of the target car. They based their conclusions on their elimination of other causes of the fire. Mr. Connell testified that the fire

could not have been of electrical origin since he found no physical evidence of an electrical fire. All of the experts called during the course of the trial expressed differing opinions as to whether some physical evidence, such as the "beading" or melting of copper, will always be found when a fire is of an electrical nature.

The target car was manufactured in Italy in December, 1975. The electrical system, which included all of the wiring in the car, was produced at two different plants. When the target car and all other Fiats were assembled, they were subjected to a quality control process, documented by a white card and a green card. The white card lists the tests performed on all cars, and the green card the special tests required for models to be sent to the United States. Mr. Mauro Pallito, an employee of Fiat, testified that he had seen both cards and that they showed that the target car had passed all the tests in the quality control process. The original of the white card was produced at depositions in Italy, but all that remains of it is a photocopy, and the green card was not produced. Mr. Pallito explained that the green cards were normally kept for six months and then discarded.

### THE CASE AGAINST FIAT

Although plaintiffs Alfa Romeo and Modern Classic sued Fiat, the ship and Uglands, they have devoted their entire effort to Fiat, charging that the fire started in the target car. The ship in turn bases its cross–claim against Fiat on the evidence that plaintiffs have introduced. The claims are based upon the expert testimony that the fire originated in the target car. Rushbrook, Connor, and Connell, the three fire experts who boarded the TORINITA upon its arrival in Los Angeles, testified that in their opinion the target car was the point of origin of the fire. Fiat's expert, Antoine Jasich, who examined the target car some two years later and examined photographs of the wreckage aboard the ship, testified that in his opinion the fire probably started in an Alfa Romeo, located on the deck

above, which he said was more severely burned than the target car.

No one knows *how* the fire started, even if it is assumed that it started in the target car. The ship's log indicates that the TORI-NITA encountered rough seas after leaving Savona. The movement of the vessel as well as the vibration of its engines may have played a part in causing the fire.

Plaintiffs produced experts to testify that the fire was caused by a defect in the target car's electrical system. Fiat produced experts to challenge this theory and to testify as to other possibilities, including defects in the ship's wiring, negligence of a crew member (dropping a cigarette), a time explosive device placed in the target car in Italy, or the carelessness of the stevedore who drove the target car onto the ship.

The plaintiffs offer three bases under which Fiat can be found liable: strict products liability, *res ipsa loquitur*, and negligence.

*Strict Products Liability*

■ Under a strict products liability theory, a manufacturer of automobiles may be liable for damages caused by a defect in its product, even though it neither is in privity with the injured plaintiffs, nor has failed to live up to any objective reasonable care standard. This theory, first enunciated in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 389, 111 N.E. 1050, 1053 (1916), has been greatly broadened and developed in recent years. It is set forth in section 402A of the Second·Restatement of the Law of Torts of the American Law Institute in the following terms:

"§ 402A. *SPECIAL LIABILITY OF SELLER OF PRODUCT TO USER OR CONSUMER.*

(1) ONE WHO SELLS ANY PRODUCT IN A DEFECTIVE CONDITION UNREASONABLY DANGEROUS TO THE USER OR CONSUMER OR TO HIS PROPERTY, IS SUBJECT TO LIABILITY FOR PHYSICAL HARM THEREBY CAUSED TO THE ULTIMATE USER OR CONSUMER, OR TO HIS PROPERTY, IF

(a) THE SELLER IS ENGAGED IN THE BUSINESS OF SELLING SUCH A PRODUCT, AND

(b) IT IS EXPECTED TO REACH THE USER OR CONSUMER IN THE CONDITION IN WHICH IT IS SOLD.

(2) THE RULE STATED IN SUBSECTION (1) APPLIES ALTHOUGH

. (a) THE SELLER HAS EXERCISED ALL POSSIBLE CARE IN THE PREPARATION AND SALE OF HIS PRODUCT, AND

(b) THE USER OR CONSUMER HAS NOT BOUGHT THE PRODUCT FROM OR ENTERED INTO ANY CONTRACTUAL RELATION WITH THE SELLER.

*Caveat*: The Institute expresses no opinion as to whether the rules stated in this Section may apply

(1) to harm to persons other than users or consumers;

(2) to the seller of a product expected to be processed or otherwise changed before it reaches the user or consumer; or

(3) to the seller of a component part of a product to be assembled."

■ With regard to the caveat, there are cases holding that the doctrine includes, as here, injury to persons or property of persons other than users or consumers of the product, and injury before the product has reached the market where it is to be sold. *See, e. g., Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1124 (2d Cir. 1975); *Pan–Alaska Fisheries, Inc. v. Marine Construction and Design Co.*, 565 F.2d 1129, 1134 (9th Cir. 1977); *Ionmar Cia. Naviera, S.A. v. Central of Georgia R.R. Co.*, 471 F.Supp. 942, 952 (S.D.Ga.1979); *Elmore v. American Motors Corp.*, 70 Cal.2d 578, 75 Cal.Rptr. 652, 657, 451 P.2d 84, 89 (1969). However, in all the cases where the doctrine has been applied,[1] there was either

---

1. Fiat contends that the public policies underlying strict products liability principles, for example, the need to remedy the unequal bargaining positions between manufacturers and consumers, the need to spread throughout society the costs of injuries due to product defects, and the

direct evidence of a defect in the manufacture or design of the product, *see, e. g., Codling v. Paglia*, 32 N.Y.2d 330, 342, 345 N.Y.S.2d 461, 469–70, 298 N.E.2d 622, 628–629 (1973), or such a defect was inferred by the evidence as to the event itself under *res ipsa loquitur*, see *infra* pp. 1279–1280.

■ Alfa Romeo and Modern Classic contend that the evidence indicates a design defect or a manufacturing defect in the electrical system of the target car.

*Evidence of a Design Defect.* Alfa Romeo and Modern Classic called Dr. Frederich Sandel, an electrical engineer who, as a hobby, engages in the restoration of foreign cars. However, he apparently had never before been consulted regarding the electrical systems of automobiles. Sandel's conclusions were largely based upon internal memoranda and manuals supplied by Fiat to its customers and his examination of a Fiat Spyder purchased by one of plaintiffs' attorneys.

Most of the documents relied upon by Sandel relate to models other than the 1976 model Spyder. Since the wires on other models are routed differently, the wire connections are different, and the car bodies are manufactured at different plants, the weight given by the court to these documents is substantially diminished. For example, plaintiffs' Exhibit A–3 refers to problems with courtesy lights, but this problem did not apply to 1976 Spyders because of the different location of the courtesy lights on this model. Similarly, Exhibit A–6, referring to electrical problems with

air conditioners, does not apply to 1976 Spyders, which do not have air conditioning as an available option.

Fiat called Gideon Durocher, an electrical engineer for Essex Wiring Company, which supplies wiring to all American auto companies. Durocher testified that the number of complaints made to Fiat concerning electrical systems was not surprising considering the number of Fiats, including Spyders, entering the market. According to Durocher, complaints involving electrical systems are always large,[2] second only to complaints concerning paint. Finally, Fiat's warranty statistics do not indicate the number of breach of warranty claims, if any, based upon fires in Fiat Spyders, or for repairs occasioned by short circuits in their electrical systems.

Sandel's testimony was based upon his examination of a Fiat Spyder purchased by one of plaintiffs' attorneys, which he assumed to be in the same condition as it was when it left the manufacturer. However, the dealer from whom the car was purchased testified that substantial alterations had been made by him prior to the sale and Sandel's examination. For example, the rust–proofing identified by Sandel as flammable, several circuits on one of the fuses, and some of the "hanging wires" criticized by Sandel were attributable to acts of the dealer in readying the car for the market[3] and would not have been present in the target car.

The parties' witnesses disagreed as to whether certain features of the Spyder's

need to induce manufacturers to design and produce safe products, do not apply to corporations suing each other. *See Scandinavian Airline System v. United Aircraft Corp.*, 601 F.2d 425, 428–29 (9th Cir. 1979); *Tokio Marine & Fire Insurance Co. v. McDonnell Douglas Corp.*, No. 75 Civ. 5915 (S.D.N.Y. Nov: 3, 1979). Alfa Romeo and Modern Classic contend that any plaintiff, including a corporation, suffering damages caused by a defective product may recover without showing negligence, citing two New York Appellate Division cases, *Potsdam Welding & Machine Co. v. Neptune Microfloc, Inc.*, 57 App.Div.2d 993, 994, 394 N.Y.S.2d 744, 746 (3d Dept. 1977) and *John R. Dudley Construction, Inc. v. Drott Manufacturing Co.*, 66 App.Div.2d 368, 371, 412 N.Y.S.2d 512, 513

(4th Dept. 1979). In view of its findings on the merits, the court finds it unnecessary to decide this question.

2. Plaintiffs challenge Durocher's opinion as biased insofar as he has always been employed by the auto industry. However, plaintiffs produced no facts to rebut Durocher's testimony that the number of complaints about the electrical system was normal for the industry.

3. It is apparently common for a dealer to install "options" such as air conditioning or, as in this case, a radio, in order to make the car more marketable. Any electrically powered equipment added must be connected by the dealer to the electrical system of the car.

electrical system constituted design defects. Sandel testified that the fuses in the Spyder did not function correctly, while Durocher testified that they were identical to fuses used in many other makes of cars and were satisfactory. Sandel opined that the clips used to hold the wires in place were too sharp and should have been flared in order to avoid cutting into the wires and causing a short circuit. However, Durocher testified that the use of the clips was acceptable since the sharp edges faced away from the wires and therefore could not cut them. Sandel thought that the ignition switch and its connecting wires were placed so low on the dashboard that they could be dislodged by a driver's foot. However, Durocher testified that the location of the switch and wires was standard, that no hanging wires could possibly be hit by a driver's foot, and that many other makes have wires attached the same way. Durocher described the "boot" that fits over all the wires leading to the ignition switch in order to protect them from being dislodged. Having reviewed all of the testimony, the court finds that the plaintiffs have not established that the design of the Fiat Spyder was defective.

*Evidence of a Manufacturing Defect.* Plaintiffs do not point to any specific manufacturing defect in either the target car or the vehicle purchased for examination by Sandel. Plaintiffs' claim is based upon the failure of Fiat to produce white and green quality control cards for the target car.

Pallito, Fiat's employee, testified that he had studied both the green and white cards, but made no report with respect to them since they indicated no defects. The green card covers only the special tests required for cars being exported to the United States and are destroyed after six months. The original of the white card, which lists tests to be conducted on all models of all cars, was produced at depositions in Italy, and a photocopy was produced at trial. Plaintiffs contend that the target car did not pass the quality control tests, based upon the fact that not all of the items on the white card are punched. However, Pallito explained in his deposition that only the overall approval line for each section is punched. The photocopy of the white card, Exhibit A–22, indicates that each heading has been punched for approval, and none of the boxes on the card indicating defects have been punched.

*Physical Evidence on Board the Ship After the Fire.* The three fire experts who examined the target car on the ship in Los Angeles did so nineteen days after the fire. None of them found any evidence of an electrical fire. Of the three fire experts who examined the wreckage of the target car, only Connell undertook a comprehensive examination of the vehicle. Connell testified that if there had been an electrical fire, he would have found some physical evidence of it such as the "beading" or melting of copper. Since he found no such evidence, Connell concluded that the fire was not of electrical origin. Connor and Rushbrook testified that no such evidence need exist in order for a fire to be of an electrical nature and that, in any event, such evidence would not have been discoverable after a fire of this magnitude. Based upon the testimony, the court concludes that, although it may not be necessary to find physical evidence, such as "beading," in order to prove that a fire is of electrical origin, such evidence will often appear. The absence of such evidence further indicates that the plaintiffs have failed to establish that the fire started in the electrical system of the target car or that, if it did, the fire was due to a design or manufacturing defect in its electrical system.

*Res Ipsa Loquitur*

■ A car spontaneously starting to burn may give rise to a permissible inference that it was defective, and that a defect existed when it left the hands of the defendant. *See, e. g., Franks v. National Dairy Products Corp.,* 414 F.2d 682, 685–87 (5th Cir. 1969); *Moraca v. Ford Motor Co.,* 66 N.J. 454, 332 A.2d 599, 601 (1975); *Gherna v. Ford Motor Co.,* 246 Cal.App.2d 639, 55 Cal.Rptr. 94, 100 (1966). As the New York Court of Appeals stated in the landmark case of *Galbraith v. Busch,* 267 N.Y.

230, 234, 196 N.E. 36, 38 (1935), "The doctrine of res ipsa loquitur is not an arbitrary rule. It is rather a common–sense appraisal of the probative value of circumstantial evidence." The court then observed that the doctrine is not called into play unless there is evidence "which shows at least probability that a particular accident could not have occurred without legal wrong by the defendant." *Id. Accord, United States v. Ridolfi*, 318 F.2d 467, 470 (2d Cir. 1963).

■ The procedural effect of *res ipsa loquitur* is not to provide a presumption of the liability of the defendant on the basis that its product went awry. Rather, the doctrine merely warrants the inference of negligence or, in this case, strict liability, *see Kroger Co. v. Bowman*, 411 S.W.2d 339, 341 (Ky.1967); *State Farm Mutual Automobile Insurance Co. v. Anderson–Weber, Inc.*, 252 Iowa 1289, 110 N.W.2d 449, 452 (1961), that the finder of fact may draw, or not, as its judgment dictates. *George Foltis, Inc. v. City of New York*, 287 N.Y. 108, 115, 38 N.E.2d 455, 459–60 (1941); *Sullivan v. Crabtree*, 36 Tenn.App. 469, 258 S.W.2d 782, 785 (1953). Certainly there are exceptional cases in which the inference of liability will be so compelling that a verdict must be directed for the plaintiff. *See, e. g., Moore v. Atchison, Topeka, and Santa Fe Railway Co.*, 28 Ill.App.2d 340, 171 N.E.2d 393, 398–99 (1960) (head–on collision of two trains on the same track). In the ordinary case, however, *res ipsa loquitur* merely permits the finder of fact to choose to infer defendant's liability in preference to other permissible inferences. However, the burden of proof lies with the plaintiffs, and they have failed to satisfy the court that the possibility of an electrical defect was more likely than the other possibilities offered at trial. *See, e. g., Scanlon v. General Motors Corp., Chevrolet Motor Division*, 65 N.J. 582, 326 A.2d 673, 679 (1974).

Moreover, the court concludes that even if it chose to draw the inference of liability here, that inference was overcome by the proof submitted by defendant concerning the design and manufacture of its Fiat Spyders. *See, e. g., McDonald v. Ford Motor Co.*, 42 Ohio St.2d 8, 326 N.E.2d 252, 256 (1975).

*Negligence*

■ In view of the finding of the court that plaintiffs have failed to prove a defect in the design or manufacture of Fiat Spyders, it follows that plaintiffs have failed to make out a case of negligence as well, since proof of such a defect would be a necessary element of their negligence claim.

## THE CASE AGAINST THE SHIPOWNER

FMNA's case against Uglands, the owner of the TORINITA, adopted by Alfa Romeo and Modern Classic, is grounded upon the theory that the TORINITA was unseaworthy and that this caused the damage to the cargo. They rely upon the Carriage of Goods by Sea Act (COGSA), which provides that "[t]he carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to–(a) Make the ship seaworthy; (b) Properly man, equip, and supply the ship . . . ." 46 U.S.C. § 1303(1). Plaintiffs contend that even if Uglands was not responsible for the cause of the fire, it was responsible for the spread of the fire. *Compare Asbestos Corp. Ltd. v. Compagnie de Navigation Fraissinet et Cyprien Fabre*, 480 F.2d 669, 672 (2d Cir. 1973). Plaintiffs claim that the ship was unseaworthy in several respects.

*Design and Construction of the TORINITA*

A seaworthy vessel is one that "is reasonably fit to carry the cargo which she has undertaken to transport." *The SILVIA*, 171 U.S. 462, 464, 19 S.Ct. 7, 8, 43 L.Ed. 241 (1898). Thus, the TORINITA was required to be reasonably fit to carry automobiles with petrol in their tanks and their batteries connected.

■ Plaintiffs contend that the TORINITA was not reasonably fit because of the large cargo spaces and open access between car decks; this increased the spread of the

fire by decreasing the concentration level of $CO_2$ in a given area. According to the plaintiffs, Uglands sacrificed fire safety by minimizing the number of bulkheads in order to allow the rapid loading and unloading of automobiles. Uglands answers that the TORINITA was reasonably fit in view of its $CO_2$ system, pointing out that it more than meets the requirement for the carriage of $CO_2$ established by the Lloyds Registry, that the ship carry enough $CO_2$ to flood the largest compartment of the ship to a thirty percent level. The TORINITA was built to carry enough $CO_2$ to establish a forty–five percent concentration level in order to meet the requirements of the Norway Sea Control, which agency knew that the ship would be carrying cars with petrol in their tanks and with their batteries connected. Moreover, evidence was introduced to show that ships larger than the TORINITA often are equipped with only half the amount of $CO_2$ carried by her.

Certificates of compliance from classification societies, compliance with regulations of the government of the flag, and comparisons with other similar ships, do not always determine the issue of seaworthiness, *see, e. g., Great American Insurance Co. v. Bureau Veritas,* 388 F.Supp. 999 (S.D.N.Y.1972), *aff'd,* 478 F.2d 235 (2d Cir. 1973), since that issue must be resolved by the court. However, based upon the testimony and documentary evidence introduced at the trial, the court is satisfied that the cargo areas of the TORINITA, though quite large, were not totally "open," but rather constituted a confined space that could be flooded with $CO_2$. The fact that the $CO_2$ system successfully extinguished the fire within a reason-

able period of time confirms the point. It thus appears that so long as the ship carried a sufficient amount of $CO_2$ to fight the fire, the design and construction of the ship did not inhibit the functioning of the $CO_2$ system.[4]

*Training of the Crew*

 Plaintiffs contend that Uglands failed to train the crew properly in firefighting procedures and that this lack of training caused the spread of the fire.[5] However, the evidence showed that all crew members were required to undergo firefighting training both before and during their assignment to the TORINITA. Moreover, the ship's officers received training in firefighting as a requisite for receipt of their licenses. Additionally, the shipowner frequently sent the officers and crew to supplemental courses dealing with firefighting procedures. The evidence further showed that the shipowners required monthly fire drills, required regular fire watches in the cargo areas, and equipped the ship with a variety of firefighting devices, including a sophisticated $CO_2$ system that successfully extinguished this serious fire.

Plaintiffs claim that faulty procedures followed by the crew in fighting the fire are evidence of the lack of training of the crew. For example, plaintiffs contend that there was a delay in sounding the fire alarm and in administering the $CO_2$, and that this delay contributed to the spread of the fire. However, the time between the initial detection of the fire by the ship's smoke detector and the administration of the $CO_2$ appears to have been well spent.

---

4. Plaintiffs also contend that the ship should have been designed with the smoke detector cabinet located on the bridge, rather than the $CO_2$ room, in order to facilitate the use of the $CO_2$ system. However, the location of the cabinet appears to bear upon the issue of when the bridge learns of the existence of the smoke, rather than its source. In this case, the bridge was informed of the existence of smoke by way of an alarm and a light. Therefore, it might have been a desirable backup system to have a smoke detector cabinet on the bridge, but such

a system was not needed in order to fight this fire.

5. The plaintiffs make no claim that the shipowner had any knowledge either of the existence of the fire or of any manifestly unseaworthy condition that caused the fire. *See, e. g., Great Atlantic & Pacific Tea Co. v. Brasileiro,* 159 F.2d 661, 664 (2d Cir. 1947); *Verbeeck v. Black Diamond Steamship Corp.,* 269 F.2d 68, 71 (2d Cir. 1959), *cert. denied,* 361 U.S. 934, 80 S.Ct. 374, 4 L.Ed.2d 355 (1960).

Within three minutes it was determined that this was no false alarm, the location of the fire was fixed, and the ship's fire alarm was sounded. Within another eleven minutes, the fire was investigated by two of the ship's officers and several crew members, the crew was mustered and accounted for, and the $CO_2$ was released. Under the circumstances, the court cannot hold that the shipowner should have established alternative procedures that would have resulted in the administration of the $CO_2$ in a shorter period of time. *See Starlight Trading, Inc. v. S.S. Luna Maersk,* 1978 A.M.C. 2090 (S.D.N.Y.1977).

■ Other purportedly improper actions on the part of the crew were, in most cases, not causally related to the spread of the fire.[6] Moreover, any improper actions by the crew members were not due to "the actual fault or privity of the carrier," as required under the fire exemption provision of COGSA, 46 U.S.C. § 1304(2)(b), nor did they constitute "neglect" by the shipowner within the meaning of the Fire Statute, *id.,* § 182. *Earle and Stoddart v. Ellerman's Wilson Line,* 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403 (1936); *Automobile Insurance Co. v. United Fruit Co.,* 224 F.2d 72, 75 (2d Cir.), *cert. denied,* 350 U.S. 885, 76 S.Ct. 138, 100 L.Ed. 780 (1955); *In re Caldas,* 350 F.Supp. 566 (E.D.Pa.1972).[7] Of particular significance is the fact that the purpose of the Fire Statute exemption is to sever the insurance aspect of a contract of carriage from the transport aspect. In this case, it is appropriate that the cargo underwriters be obligated to cover the risk that they contracted to undertake. *Consumers Im-*

*port Co. v. Kabushiki Kaisha Kawasaki Zosenjo,* 320 U.S. 249, 254–56, 64 S.Ct. 15, 17–18, 88 L.Ed. 30 (1943).

*Loading and Stowage*

Under COGSA, Uglands was responsible for properly loading and stowing the automobiles for the voyage. 46 U.S.C. § 1303; *see Nichimen Co. v. M.V. Farland,* 462 F.2d 319 (2d Cir. 1972); *Interstate Steel Corp. v. S.S. Crystal Gem,* 317 F.Supp. 112 (S.D.N.Y. 1970).

Plaintiffs contend that the cars were stowed too close together, and that passageways that could be used as firelanes were too narrow, winding, and obstructed with lashings and chains. Therefore, the fire stations were inaccessible to the crew, who had to climb over the cargo in order to reach the fire hoses and hydrants. Thus, the fire had to be fought through the use of the $CO_2$ system rather than by the use of fire hoses.[8]

■ The testimony establishes that the failure of the crew to reach the point of origin of the fire was due to the smoke and heat on deck six and not due to the lack of access. For this reason, the court concludes that the stowage of the automobiles pursuant to the stowage plan did not cause the crew to use $CO_2$ rather than hoses or fire extinguishers.

## CONCLUSION

The foregoing constitutes the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

---

6. For example, the failure of some of the members of the smoke diving teams to either report to the proper locations or to bring along the proper equipment could not have contributed to the spread of the fire, since the fire could not have been extinguished through the use of conventional equipment.

7. The rights and liabilities of a shipowner under the fire exemptions of COGSA are the same as those under the Fire Statute. *Asbestos Corp. Ltd. v. Compagnie de Navigation Fraissinet et Cyprien Fabre,* 480 F.2d at 672; *see American*

*Tobacco Co. v. The Katingo Hadjipatera,* 194 F.2d 449, 450 (2d Cir. 1951).

8. Plaintiffs further contend that the stowage of "red label" supplies such as paint remover and turpentine in the area of the cargo decks was improper and played a role in the decision to use CO2 since the existence of these stores might have made it more hazardous for the crew to fight the fire using conventional means. Except for the speculation of Connell, there is no support for this theory in the record.

The complaints of Alfa Romeo and Modern Classic, the complaint of FMNA, and the cross–claim of Uglands are dismissed.

Settle judgment on notice.