ENTE NAZIONALE PER L'ENERGIA
ELETTRICA, Plaintiff,

v.

BALIWAG NAVIGATION, INC. and
Wheelock Marine Services, Ltd.,
Defendants,

and

Rex Shipping Company S.A. of
Panama, in personam, and

M/V KUNIANG, her engines, tackle, and
apparel, etc., in rem, Defendants and
Third-Party Plaintiffs,

v.

CRAVAT COAL COMPANY,
Third-Party Defendant and
Third-Party Plaintiff,

v.

BALIWAG NAVIGATION, INC., Wheel-
ock Marine Services, Ltd., Almare So-
cieta Di Navigazione S.p.A., Cooper Ste-
vedoring Company, Inc. and Alla-Ohio
Valley Coals, Inc., Third-Party Defend-
ants.

Civ. A. No. 81–441–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

June 6, 1984.

Philip N. Davey, Seawell, Dalton, Hughes & Timms, Norfolk, Va., for plaintiffs.

Carter T. Gunn, Norfolk, Va., for Rex Shipping.

William B. Eley, Norfolk, Va., for Almare.

Gregory N. Stillman, Norfolk, Va., for Cravat.

R. Arthur Jett, Jr., Norfolk, Va., for Cooper.

Daniel R. Warman, Norfolk, Va., for Alla-Ohio.

## OPINION AND ORDER

CLARKE, District Judge.

This matter is before the Court following a nonjury trial which was held on January 18 to 20, 1984. The trial of this case has been bifurcated, with the Court in this phase to determine only the liability of the parties. After hearing the evidence, the Court directed all parties to submit post-trial briefs addressing the factual and legal issues raised. Post-trial briefs and reply briefs were timely submitted by the parties and therefore the matter is ripe for decision.

This action concerns a cargo of more than 45,000 long tons of steam coal carried by the M/V KUNIANG. The vessel's owner has settled with the consignee of the coal, and now seeks indemnity and/or contribution from the other parties involved in the shipment, as well as recovery of miscellaneous costs.

## SUMMARY OF FACTS

The undisputed facts in this case can be summarized as follows: On April 2, 1981, the M/V KUNIANG departed Darrow, Louisiana with a cargo of approximately 45,254.03 long tons of steam coal, bound for La Linea, Gibraltar, with orders to either Vado Ligure or La Spezia, Italy. The vessel was forced to divert to Miami, Florida because of mechanical problems. On April 6, 1981, while at anchor off Miami, the M/V KUNIANG dragged anchor and grounded. The vessel's bottom was severely damaged by the grounding and several cargo holds were flooded by seawater as a result.

The vessel was towed to Sewell's Point Anchorage, Norfolk, Virginia for discharge of her cargo of coal and drydocking. The M/V GARDEN NEPTUNE was designated to receive the coal from the M/V KUNIANG for shipment to its destination in Italy. On May 7, 1981, the transfer of the coal from the M/V KUNIANG to the M/V GARDEN NEPTUNE began. On May 13, 1981, the Master of the M/V GARDEN NEPTUNE refused to accept any further coal from the M/V KUNIANG because the coal was heating.

The M/V KUNIANG was towed to Elizabeth River Terminals ("ERT"), Chesapeake, Virginia on May 16, 1981, where she discharged the balance of her coal to ground storage. The coal in ground storage at ERT was eventually sold, and reloaded aboard the M/V NORDVARD, which carried approximately 41,974 metric tons of steam coal to Inkoo, Finland.

## PARTIES

The plaintiff Ente Nazionale Per L'Energia Elettrica ("ENEL") is an Italian corporation involved in the production, transmission and distribution of electricity. ENEL was the consignee of the cargo of approximately 45,254.03 long tons of steam coal loaded aboard the M/V KUNIANG.

The defendant Rex Shipping Company S.A. of Panama ("Rex") is a Panamanian corporation which was the registered owner of the M/V KUNIANG.

The defendant Wheelock Marine Services Ltd. ("Wheelock") of Hong Kong was the managing agent for the owner of the M/V KUNIANG.

The defendant Baliwag Navigation, Inc. ("Baliwag") of Manila, The Phillipines was appointed the crewing agent for the M/V KUNIANG by Wheelock.

The M/V KUNIANG is an ocean-going bulk carrier of approximately 29,000 gross tons, registered under the flag of the Republic of Panama.

Third-party defendant Almare S.p.A. di Navigazione ("Almare") is an Italian corporation which time-chartered the M/V KUN-IANG from Rex. Almare voyage-chartered the M/V KUNIANG to ENEL.

Third-party defendant Cravat Coal Company ("Cravat") is an Ohio corporation which contracted to sell approximately 200,000 metric tons of steam coal to ENEL in four approximately equal shipments. The coal on the M/V KUNIANG represented the second of the four scheduled shipments. Cravat is a producer and seller of coal in the domestic and export markets.

Third-party defendant Alla-Ohio Valley Coals, Inc. ("AOV") is a Florida corporation presently operating as a debtor-in-possession under bankruptcy proceedings in the United States District Court for the District of Columbia pursuant to Chapter 11 of the Bankruptcy Code. AOV actually supplied the coal loaded on the M/V KUNIANG, pursuant to an agreement with Cravat.

Third-party defendant Cooper Stevedoring Co., Inc. ("Cooper") is an Alabama corporation which loaded the coal aboard the M/V KUNIANG at Darrow, Louisiana between March 25 and April 2, 1981.

## ACTIONS

This action was initiated by the filing of a complaint by ENEL on May 19, 1981 against Rex *in personam* and the M/V KUNIANG *in rem.* ENEL brought suit under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1303, alleging that the shipowner violated its common carrier duties to make the M/V KUNIANG seaworthy; to man, equip and supply the vessel properly; and to load, handle, stow, carry, keep, care for, and discharge the cargo of coal properly and carefully. ENEL later by amendment added Baliwag and Wheelock as defendants. On October 6, 1983, a settlement agreement between ENEL, Rex and Almare was filed with the Court. By the terms of the agreement, Rex agreed to pay ENEL $1,115,000.00 to settle the cargo claim, plus $150,000.00 in prejudgment interest. By Order of January 18, 1984, the complaint of ENEL was

dismissed with prejudice. As a result, ENEL is no longer a party to this action.

Rex originally filed a counterclaim against ENEL, third-party complaints against Cravat and Cooper, and a counterclaim against AOV. In addition, Rex's third-party complaint against Almare was stayed pending arbitration by Order of May 14, 1982. Rex's counterclaim against ENEL was dismissed without prejudice, but subject to Rex's covenant not to sue ENEL, as set forth in the October 6, 1983 settlement agreement, by Order of January 18, 1984. The lodged third-party complaint against Almare was withdrawn, also by Order of January 18, 1984. Finally, a settlement agreement between Rex and Cooper, in which Cooper agreed to pay Rex $40,000.00 and the parties agreed to dismiss with prejudice their claims against each other, was filed in open Court on January 18, 1984. By Order of May 7, 1984, the third-party claim of Rex against Cooper and the cross-claim of Cooper against Rex were dismissed with prejudice.

Consequently, Rex's only remaining claims are its third-party complaint against Cravat and its counterclaim against AOV. Rex alleges that the coal loaded on board the M/V KUNIANG was unusually susceptible to spontaneous combustion. Rex seeks to recover from Cravat and AOV the costs it incurred in handling the coal once it heated, including its required contribution in General Average, the cost of discharging the coal at ERT, and the cost of ground storage. Additionally, Rex seeks to recover the amount it paid to ENEL pursuant to the settlement agreement.

Cravat has filed a counterclaim against Rex, as well as third-party claims against Cooper, Almare, AOV, Baliwag and Wheelock.

AOV has filed third-party claims against Cooper, Almare, Rex and Cravat. AOV's crossclaim against ENEL was dismissed without prejudice by Order of January 18, 1984.

Cooper has filed crossclaims against Cravat, AOV and Almare. Its counterclaim against ENEL was dismissed without prejudice by Order of January 18, 1984. Pursuant to a settlement agreement filed in open Court on January 18, 1984, Cooper agreed to dismiss with prejudice its claim against Rex. By Order of May 7, 1984 Cooper's claim against Rex was dismissed with prejudice.

Almare, which did not appear during the trial, has outstanding counterclaims against AOV, Cooper and Cravat. Its counterclaim against ENEL was dismissed without prejudice by Order of May 12, 1983.

## FINDINGS OF FACT

Many of the material facts in this case are not in dispute and have been agreed to by stipulation of the parties. The chain of events leading to the present controversy is complex, and must be discussed in some detail.

On June 17, 1980, Cravat contracted to sell approximately 200,000 metric tons of Pond Creek type steam coal to ENEL in four approximately equal shipments. Although the contract between Cravat and ENEL originally called for Cravat to ship the coal through the port of Hampton Roads, by a November 1980 amendment to the contract the parties agreed to ship the coal through the port of New Orleans. Commercial Testing and Engineering Co. ("CTE"), a commercial testing laboratory, was designated to test the coal to determine whether it met the contract specifications.

In November 1980, Cravat determined that it would be unable to supply the coal called for in its contract with ENEL. Consequently, Cravat and AOV entered into an agreement on November 28, 1980, in which AOV agreed to supply the coal called for in the ENEL contract. AOV and Cravat agreed that Cravat was to be listed as the shipper on the bill of lading and other shipping documents. AOV's involvement was not revealed to either ENEL or Rex.

AOV contracted with various coal suppliers to buy barge loads of coal. AOV obtained the coal for the shipment in question

from nine suppliers. The coal was carried aboard barges to the loading site.

The M/V KUNIANG, which Almare had time-chartered from Rex and then voyage-chartered to ENEL, arrived at the Mississippi River on March 21, 1981. The vessel proceeded to LaGrange Anchorage, Belle Chase, Louisiana. From there the M/V KUNIANG proceeded to its loading berth at Darrow, Louisiana, where it arrived on March 25. Prior to loading, each of the vessel's cargo holds were inspected for cleanliness and readiness to load coal by SGS Control Services, Inc. ("SGS") and Deep Sea Marine Surveyors, Inc. The last of the holds passed inspection on March 26.

Cooper's berth at Darrow is a mid-stream loading berth. Coal is transferred from the barges to the vessel by floating cranes, which lift the coal into the ship using clamshell type buckets. The loading of the M/V KUNIANG began on the morning of March 25, and was completed on April 2, 1981. The coal was stowed in the holds in a peaked fashion. Cooper failed to trim the coal or compact it, although it admits that this is normal practice. Trimming the cargo of coal would have entailed leveling the cargo across the hold so that the cargo would have been at the same level at the walls or bulkheads of the hold as at the center of the hold. Such leveling is done with a tractor or bulldozer, which also compacts the coal.

Prior to loading, the coal was sampled and analyzed by CTE and SGS, both commercial testing laboratories. The testing companies reported that the coal met the contract specifications. Neither company reported any problems with the coal.

During the loading of the vessel, the Master of the M/V KUNIANG, Capt. Jose A. Calbes, observed what appeared to be steam coming from the coal aboard two of the barges. At the Captain's request, AOV arranged for the examination of the coal aboard the two barges by SGS and CTE. Both loads of coal were examined by the testing lab employees and were reported by SGS to be "in good exportable condition." The Master thereafter accepted the coal aboard the two barges for loading aboard the M/V KUNIANG.

Almare and Rex had appointed Strechan Shipping Co. as their husbanding agents. The Master of the M/V KUNIANG, Capt. Calbes, authorized Strachan to sign the bill of lading on his behalf. Both AOV and Cravat had appointed M. G. Maher & Co. to act as their representative. M. G. Maher & Co. prepared the shipping documents, with Cravat listed as the shipper. After the completion of loading on April 2, the Master authorized the Strachan representative to sign the several copies of the bill of lading tendered by the M. G. Maher & Co. agent. No comments were made on the bill of lading concerning the quality of the coal or its suitability for shipment. The bill of lading was completely "clean".

In addition, upon the completion of the loading of the M/V KUNIANG, SGS issued a certificate of loading, dated April 2, 1981, stating that the vessel was loaded "in accordance with all known practices of good seamanship, with observance of all known rules and regulations for loading coal in bulk." The certificate was signed by the Master of the M/V KUNIANG.

The M/V KUNIANG departed Darrow for La Linea, Gibraltar on the morning of April 2, 1981 with the cargo of approximately 45,254.03 long tons of steam coal, with a final destination of either Vado Ligure or La Spezia, Italy. The vessel expected to arrive in Italy in approximately 15 to 18 days.

Shortly after the vessel got underway on April 2, the ship developed an engine problem. It was determined that seawater had contaminated the vessel's main engine lube oil. The lube oil purifiers were unable to remove the seawater from the lube oil, and it became necessary to shut down the main engine. The M/V KUNIANG was then located west of Florida in the Gulf of Mexico. Beginning April 4, during the time the vessel was in the Gulf of Mexico, temperatures were periodically taken of the coal by the Chief Mate, at the Captain's direction.

The contaminated lube oil was drained and replaced by spare lube oil which had been carried aboard the vessel. On the morning of April 4, the M/V KUNIANG resumed her voyage. Two hours after the vessel resumed her voyage, however, the Chief Engineer informed Capt. Calbes that the ship did not have enough spare lube oil on board to complete the transatlantic crossing. The Captain decided to divert the vessel to Freeport, Bahamas where additional lube oil could be obtained to replenish the M/V KUNIANG's supply.

The vessel had almost arrived in Freeport when Capt. Calbes received a message from Wheelock, the managing agent for Rex, directing the ship to divert to Miami, Florida to obtain the additional lube oil. The vessel's owners had a contract with Exxon for the supply of lube oil and Wheelock advised the Captain that there was no Exxon facility in Freeport.

The vessel turned around and headed for Miami, where it arrived on the afternoon of April 5, 1981. The vessel did not have on board adequate pilot charts of the Miami area. The vessel anchored once, dragged anchor, and reanchored. On April 6, the M/V KUNIANG dragged anchor again and grounded. The bottom of the vessel was severely damaged by the grounding. Hold 8 was completely flooded by seawater, and Holds 6 and 7 were partially flooded.

The M/V KUNIANG remained anchored off Miami from April 5 to April 13, 1981. During this period the hatch covers of the vessel's cargo holds were periodically opened. It was determined that the vessel could not continue the voyage and would have to be drydocked for repairs. The vessel left Miami in tow on April 13, 1981, headed for Norfolk, Virginia.

Problems during the towing of the vessel required the vessel to anchor off Jacksonville, Florida on April 13. The tow resumed on April 14. During the tow to Norfolk the hatch covers of the vessel's cargo holds were periodically opened. The ship arrived at Sewell's Point Anchorage, Norfolk, Virginia on April 21, nineteen days after departing Darrow.

It was necessary to offload all of the coal from the M/V KUNIANG in order for the ship to enter drydock for repairs. It was decided that the coal from the M/V KUNIANG would be offloaded to another ship. The M/V GARDEN NEPTUNE was selected to receive the coal and carry it to its destination in Italy. The M/V GARDEN NEPTUNE was moored parallel to the M/V KUNIANG, with a bucket crane between the two vessels. The transfer of the coal from the M/V KUNIANG to the M/V GARDEN NEPTUNE began on May 7, 1981. During the transshipment process the hatch covers of the cargo holds were left open continually.

During the transshipment operation, the two vessels suffered considerable physical damage from being struck by the crane and barges. On May 13 the Master of the M/V GARDEN NEPTUNE refused to accept any more coal from the M/V KUNIANG because the coal had begun to heat. The transshipment operation was thereafter terminated, due to a combination of factors, including the heating of the coal, and the damage sustained by the vessels. On May 14, discharge of the M/V KUNIANG continued into barges.

On May 16, the M/V KUNIANG was towed to Elizabeth River Terminals, Chesapeake, Virginia, where the remainder of the vessel's cargo of coal was discharged to ground storage. The vessel completed discharging all of the coal, with the exception of approximately 100 tons of seawater wetted coal remaining in Hold 8, on May 27. The barges which had received coal from the M/V KUNIANG at Sewell's Point were discharged to ground storage at ERT from May 18 to 24. The M/V GARDEN NEPTUNE discharged the approximately 14,418 long tons of coal she had received from the M/V KUNIANG at ERT from May 30 to June 5. On June 5, 1981, after all of the coal had been discharged to ground storage at ERT, Rex declared the voyage abandoned.

While in ground storage at ERT, the coal was reblended. AOV repurchased the coal in ground storage from ENEL. The coal

was resold by AOV at a substantial profit. Beginning September 12, 1981, the coal was transported by barge from ERT to Lambert's Point Dock, Norfolk, Virginia, where it was loaded aboard the M/V NORDVARD. Loading was completed on September 22, and the M/V NORDVARD departed for Inkoo, Finland. The M/V NORDVARD carried the cargo of 41,974.-29 metric tons of steam coal safely to Finland.

After thoroughly examining all of the testimony and evidence, the Court FINDS that the heating of the coal was caused by the combined acts of Cooper, Rex, AOV and Cravat.

Cooper's failure to trim and compact the coal contributed to the heating of the coal. Eugene Dalton, Sales Manager for Cooper, and other Cooper representatives testified that Cooper was aware that coal is subject to spontaneous combustion. Although Cooper admits that it was normal practice to tractor trim and compact coal after loading, Cooper failed to trim or compact the coal after it was loaded aboard the M/V KUNIANG. Instead, Cooper left the coal peaked in the holds.

Dr. William F. Berry, who appeared as the expert for Rex, testified that if coal is loaded in a peaked form it can create a chimney effect, which, when combined with ventilation of the coal, causes the coal to heat more rapidly. Harold David Wilkins, Operations Manager for Cooper, testified that Cooper normally tractor trimmed and compacted a coal cargo to "keep oxygen out of it." Cooper was therefore aware of the chimney effect Dr. Berry testified about. Cooper alleges that the M/V KUNIANG was a self-trimming bulk carrier, and as such it would be expected to assist in trimming itself. Cooper admits, however, that even when a vessel is self-trimming it is necessary to at least bucket trim the cargo. The Court has found that Cooper failed to trim the coal cargo. The failure of Cooper to trim and compact the coal in the holds was a contributing cause of the heating.

Rex contributed to the heating of the coal by ventilating the coal cargo and by delaying the voyage. Capt. Calbes first ordered that the coal be ventilated on April 4, 1981, while the vessel was in the Gulf of Mexico, because he thought that the temperature readings taken by the Chief Mate were "a little bit high." The coal was ventilated in Miami and while in tow to Norfolk. Furthermore, the hatchcovers were open every day during the transshipment process.

Dr. Berry testified that his opinion as to the cause of the heating would have been different if he had known that the coal had been ventilated. He opined that ventilation, especially of a coal cargo which has not been trimmed and compacted, increases the likelihood of spontaneous combustion. Ventilation of the coal by the crew of the M/V KUNIANG was a contributory cause of the heating.

Rex also contributed to the heating of the coal by delaying the voyage. Rex was initially responsible for the delay because the vessel's main engine lube oil became contaminated by seawater as a result of a hole in a pipe in the vessel's water cooling system. Rex ordered the vessel to Miami to obtain lube oil despite the absence of adequate pilot charts of the area aboard the vessel. Without adequate charts to guide the crew, the vessel ran aground and was severely damaged. As a result, the transshipment operation became necessary. The need to transship the coal caused the voyage to be substantially delayed.

AOV and Cravat contributed to the heating of the coal by their failure to warn the ship's Master that the steam coal loaded aboard the M/V KUNIANG contained a relatively large percentage of fines. The Master of the vessel was not aware of the fine content of the coal cargo. AOV and Cravat specifically should have warned the Master to avoid ventilation of the coal.

The Court FINDS that if the coal had not heated, the transshipment operation would have been successful and the coal would have reached Italy safely. The Court fur-

ther FINDS the responsibility for the heating of the coal to be apportioned as follows:

| | |
|---|---|
| Cooper | ⅓ |
| Rex | ⅓ |
| AOV & Cravat | ⅓ |

## CONCLUSIONS OF LAW

This is an action for contribution and indemnification brought by defendant and third-party plaintiff Rex. The Court has jurisdiction pursuant to general federal maritime jurisdiction, 28 U.S.C. § 1333 and the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300–1315.

Rex advances three legal theories under which it seeks to recover from Cravat and/or AOV. First, it asserts that Cravat is absolutely liable to Rex under COGSA, 46 U.S.C. § 1304(6). Second, it claims that Cravat and AOV are liable to Rex under the products liability doctrine of strict liability. Finally, it alleges that Cravat and AOV are liable to Rex under general maritime law for their negligence.

### I. COGSA, 46 U.S.C. § 1304(6)

Under this theory, the primary issue is whether the coal loaded aboard the M/V KUNIANG had an unusually high propensity to combust spontaneously, and, if so, whether Cravat failed to warn Rex of this propensity.

Should the Court find that the coal loaded aboard the M/V KUNIANG was highly susceptible to spontaneous combustion, and that the vessel was not so warned, the Court must decide whether Cravat is liable to Rex. Rex contends that as the shipper of record on the bill of lading Cravat is liable to Rex. Cravat contends that it assigned its obligations under its contract with ENEL to AOV, and that, therefore, it is relieved of its obligations under the contract. AOV, on the other hand, contends that it was not assigned the Cravat-ENEL contract, and that Cravat remained responsible to ENEL to execute the contract.

Rex originally claimed in the alternative that the heating of the coal was caused by Cooper's failure to properly blend and compact the coal prior to loading. The Court need not address this claim because it has been rendered moot by the settlement agreement Rex and Cooper entered into on January 18, 1984. Rex is barred from seeking any additional recovery from Cooper by virtue of the settlement agreement.

Thus, the Court need only determine if Cravat is liable under the theory of recovery Rex asserts. Rex bases its claim against Cravat on the theory that the coal supplied by AOV under the Cravat-ENEL contract had an unusually high propensity toward spontaneous combustion because it contained an excessive amount of fines. Rex claims that Cravat failed to warn Rex of this propensity and is therefore liable to Rex pursuant to § 1304(6) of COGSA.

Section 1304(6) of COGSA provides:

Goods of an inflammable, explosive, or dangerous nature to the shipment whereof the carrier, master or agent of the carrier, has not consented with knowledge of their nature and character, may at any time before discharge be landed at any place or destroyed or rendered innocuous by the carrier without compensation and the shipper of such goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment. If any such goods shipped with such knowledge and consent shall become a danger to the ship or cargo, they may in like manner be landed at any place, or destroyed or rendered innocuous by the carrier without liability on the part of the carrier except to general average, if any.

Rex alleges that the coal which was loaded aboard the M/V KUNIANG was highly susceptible to spontaneous combustion and therefore "inflammable" and "dangerous" within the meaning of § 1304(6). Rex further alleges that the master of the vessel did not consent to the carriage of the coal with knowledge of its "inflammable" and "dangerous" nature within the meaning of § 1304(6).

Cravat counters that the evidence does not justify the conclusion that the coal which was loaded aboard the M/V KUNIANG was unusually susceptible to sponta-

neous combustion. Cravat further alleges that the evidence that the master of the M/V KUNIANG consented to the carriage of the coal knowing that all coal is subject to spontaneous combustion.

■ Cravat argues that although it was listed on the bill of lading as the shipper of record it should not be held liable to Rex under 46 U.S.C. § 1304(6) because it assigned its obligations under its contract with ENEL to AOV. This position is groundless. The evidence is clear that Cravat did not assign its contract with ENEL to AOV. Rather, Cravat entered into a separate agreement with AOV in which AOV agreed to supply the coal called for in the amended ENEL-Cravat contract. Cravat did not manifest an intent to assign its contract with ENEL to AOV. Cravat requested that it remain on the bill of lading as shipper. In addition, AOV's participation was not disclosed to ENEL.

■ The Court can find only one reported case in which a court considered whether a shipper had breached 46 U.S.C. § 1304(6). In *Skibs A/S Gylfe v. Hyman-Michaels Company*, 304 F.Supp. 1204, 1221 (E.D.Mich.1969), *aff'd.*, 438 F.2d 803 (6th Cir.), *cert. denied*, 404 U.S. 831, 92 S.Ct. 73, 30 L.Ed.2d 61 (1971), a cargo of steel turnings spontaneously heated. The shipowner alleged that the shipper had failed to adequately inform the Master concerning the "nature and character" of the steel turnings prior to loading. *Id.* at 1221. The Court found that § 1304(6) had not been violated because the Master was aware of the hazard presented by the steel turnings. *Id.*

Rex relies principally on the testimony of its expert, Dr. William Berry. Dr. Berry testified that the coal loaded aboard the M/V KUNIANG had an unusually high propensity to spontaneously combust. This propensity, Dr. Berry opined, was due to the presence of 50% fines·in the coal loaded aboard the vessel. Fines were described by Dr. Berry as being small particles of steam coal. Dr. Berry testified that steam coal containing fines should be intimately blended before loading. He further testi-

fied that because the coal carried aboard the M/V KUNIANG was not intimately blended prior to its loading, it had a propensity to heat five times greater than that of the coal specified in the ENEL-Cravat contract. Dr. Berry indicated that if the M/V KUNIANG's coal cargo had been blended properly it could have been transferred successfully to the M/V GARDEN NEPTUNE and delivered to its destination in Italy, despite the high percentage of fines it contained.

Cravat contends that the evidence does not justify the conclusion that the coal loaded aboard the M/V KUNIANG was unusually susceptible to spontaneous combustion. Cravat cites the testimony of Roy Potter, head of Quality Control for the Mineral Division of SGS, who stated that a chemical analysis of the coal did not indicate that it was unusually susceptible to spontaneous combustion. Cravat also points out that Dr. Berry admitted that all coal is susceptible to spontaneous combustion, and that some coal is even more likely to combust spontaneously than that carried aboard the M/V KUNIANG. Dr. Berry admitted further that the coal could have been shipped safely, and in fact was eventually shipped to Finland without mishap.

Assuming *arguendo* that the coal loaded aboard the M/V KUNIANG was unusually susceptible to spontaneous combustion, and therefore "dangerous" and "inflammable" within the meaning of § 1304(6), Rex must prove that the Master, Capt. Calbes, did not consent to the carriage of the coal with knowledge of its "inflammable" and "dangerous" nature. *See Skibs A/S Gylfe v. Hyman Michaels Company*, 304 F.Supp. at 1221. Rex has failed to prove by a preponderance of the evidence that the Master lacked knowledge of the susceptibility of coal to spontaneous combustion. Rather, the evidence is to the contrary.

First, Capt. Calbes admitted that he was aware that coal might spontaneously combust. He further testified that he knew that coal can become dangerous to carry if it reaches certain temperatures. Second, the Master of the vessel conceded that he

noticed what he thought was coal steaming on two of the barges during the loading. Yet, he accepted the coal aboard the M/V KUNIANG. Finally, the evidence is clear that the crew took temperature readings of the coal cargo, at the Master's direction, on a regular basis. All of these facts demonstrate knowledge on the part of Rex of the coal's "inflammable" nature.

In conclusion, the Court FINDS that the Master of the M/V KUNIANG consented to the carriage of the coal with knowledge of its propensity to spontaneously combust. Rex has therefore failed to establish by a preponderance of the evidence the second element necessary to prove a case under 46 U.S.C. § 1304(6). Rex may not recover against Cravat pursuant to 46 U.S.C. § 1304(6).

## II. PRODUCTS LIABILITY

Although Rex did not include a strict products liability claim in its triable issues in the Final Pretrial Order, the Court will consider the claim. Specifically, Rex asserts that AOV and Cravat should be held strictly liable under Section 402(A) of the Restatement (Second) of Torts. Section 402(A) provides:

402(A). SPECIAL LIABILITY OF SELLER OF PRODUCT FOR PHYSICAL HARM TO USER OR CONSUMER.

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Rex correctly asserts that strict products liability has been applied in the admiralty context. *See, e.g., Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co.*, 565 F.2d 1129, 1134–35 (9th Cir.1977) and cases cited therein. Rex relies upon *Alfa Romeo, Inc. v. S.S. TORINITA*, 499 F.Supp. 1272 (S.D.N.Y.1980), as an admiralty case in which § 402(A) was applied. In that case, two cargo interests sued a third cargo interest for damages to a cargo of automobiles caused by a fire which occurred while the automobiles were aboard the ship, claiming that the fire was due to the defective design and manufacture of the automobiles. *Id.* at 1274. The Court held that the third cargo interest could not be held liable on a theory of strict liability because the plaintiffs had failed to prove that a design or manufacturing defect was the cause of the fire. *Id.* at 1279. The Court did recognize, however, that the doctrine of strict liability may be applied in a case involving an injury to a non-consumer when there is evidence of a manufacturing or design defect. *Id.* at 1277–78.

AOV and Cravat correctly assert that § 402(A) is inapplicable to the facts of this case. First, the damages which Rex seeks to recover consist of neither damages for "physical harm" nor "property" damage, the items of damage which are compensable under § 402(A). Second, strict liability is not usually applied in commercial cases. It is ordinarily limited to dealings between a commercial seller and a non-commercial consumer. *See Purvis v. Consolidated Energy Products Co.*, 674 F.2d 217, 222 (4th Cir.1982).

In the cases in which the doctrine has been applied to dealings between two commercial entities, there has been an allegation that the product involved was defectively designed or manufactured. *See, e.g., Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co.*, 565 F.2d 1129, 1134 (9th Cir.1977); *Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1124 (2nd

Cir.1975); *Alfa Romeo, Inc. v. S.S. TORI-NITA*, 499 F.Supp. at 1277–78. Such an allegation was not made by Rex. Furthermore, it is not clear that coal can be considered a "product," because it is a naturally occurring organic substance.

■ The Court declines to adopt strict liability in this case for the foregoing reasons.

### III. NEGLIGENCE

Rex alleges that Cravat and AOV are liable under general maritime law for their negligence because they failed to ascertain the nature and characteristics of the coal and because they failed to warn the shipowner of the hazards inherent in the cargo of steam coal. AOV and Cravat contend that no warning was necessary because the Master of the M/V KUNIANG knew that coal has a propensity to self-heat.

■ Under maritime common law, a cargo owner has a duty to warn a shipowner of the foreseeable hazards inherent in a cargo of which the ship's Master was not aware and could not reasonably have been expected to be aware. *See, e.g., Ionmar Compania Naviera, S.A. v. Olin Corp.*, 666 F.2d 897, 904 (5th Cir.1982). The Court has found that Cravat and AOV failed to notify the Master of the M/V KUNIANG that the steam coal loaded aboard the vessel contained a relatively large percentage of fines, and that this was a contributing factor in the heating of the coal. The Court further found that the vessel's Master was not aware of the fine content of the cargo. Cravat and AOV knew that fines were more susceptible to spontaneous combustion, yet failed to warn the vessel's Master of this fact. Although, as AOV and Cravat correctly assert, the Master knew that coal was susceptible to spontaneous combustion, he did not know that the presence of fines would increase the cargo's susceptibility. AOV and Cravat were negligent in failing to warn the Master about the cargo's fine content. Furthermore, AOV & Cravat were negligent in failing to warn the Master about the hazards of ventilation. The Court holds that AOV and Cravat are jointly and severally liable.

■ The Court has also found that Cooper's failure to trim and compact the coal once it was loaded into the vessel's holds was a contributing factor in the heating of the coal. Cooper admits that it failed to follow its ordinary procedures. A stevedore is liable for its negligence in breaching its duty of workmanlike performance. *Complaint of Delphinus Maritima, S.A.*, 523 F.Supp. 583, 597–98 (S.D.N.Y.1981). Cooper was negligent in failing to trim and compact the coal after it was loaded aboard the M/V KUNIANG.

Finally, the Court has found that Rex contributed to the heating of the coal by ventilating it and by causing a delay in its transport. Rex was negligent in contributing in this regard to the heating of the coal.

### ALLOCATION AND ELEMENTS OF DAMAGES

■ The Court has found that the negligence of Cravat and AOV in failing to warn the Master about the fine content of the steam coal cargo was only one of the contributing causes of the coal's heating. Specifically, the Court found that Cravat and AOV bear only one-third of the responsibility for the heating of the coal. Damages in maritime cases are to be allocated proportionately among the parties based upon their comparative fault. *See, e.g., Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246, 1249 (5th Cir.1979); *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31, 44 (3d Cir.1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). Therefore, any recovery by Rex as against AOV and Cravat is limited to one-third of amount of damages awarded in the subsequent trial on the issue of damages.

Damages are further limited to those items which can be directly attributed to the costs of handling the coal after it became too hot to be transshipped aboard the M/V GARDEN NEPTUNE. Rex's recovery is limited to the costs of handling the

coal following the May 13, 1981 refusal by the Master of the M/V GARDEN NEPTUNE to accept any further coal from the M/V KUNIANG because it was heating. These costs include the costs of carrying the coal by barge to ERT, the cost of discharging the coal at ERT, the cost of ground storage at ERT, and the cost of caring for the coal while it was in ground storage. Any other costs directly attributable to the handling of the coal after it became too hot to be transshipped to Italy aboard the M/V KUNIANG, if proven during the trial on the issue of damages, may also be recovered.

To the extent that Rex can establish that its payment to ENEL was based on these principles, it can recover one-third of such payment from Cravat and AOV.

All claims, counterclaims, and cross-claims herein, except Rex's claims against Cravat and AOV and the claims of Cravat and AOV against each other are DISMISSED with prejudice.*

Cravat and AOV have not fully briefed the matter of their claims against each other. Accordingly, Cravat and AOV are granted two weeks in which to submit simultaneous briefs on the issue. The Court will decide the matter on the briefs. IT IS SO ORDERED.

---

* Although Baliwag Navigation, Inc. was named as a defendant by ENEL in its second amended complaint, and as a third-party defendant by Cravat, the parties agreed in the Final Pretrial Order that Baliwag is not a party to this action. Wheelock Marine Services, Ltd. was also named as a defendant by ENEL in its amended complaint. Pursuant to its settlement agreement with Rex and Almare, ENEL's complaint was dismissed by Order of January 18, 1984. Cravat named Wheelock as a third-party defendant, but did not press its claim against Wheelock either during the trial or in its post-trial briefs. Additionally, the Court notes that counsel for Rex represented Baliwag and Wheelock.